UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

FAIR HOUSING JUSTICE CENTER, INC.;             18-CV-5011
JAMES BECTON; LISA DARDEN; MARCIE
HENDERSON; KENT JACKMAN; and
CLAUDE JAY JONES,                              **COMPLAINT AND**

               Plaintiffs,             **DEMAND FOR JURY TRIAL**

          v.

CHARM EQUITIES LTD; MICHAEL KOHN;
HOWARD KOHN; MICHAEL D'ANTONIO;
HIGHWAY REALTY LLC; and 1723 E15 LLC,

               Defendants.

------------------------------------------------------------X

       Plaintiffs Fair Housing Justice Center, Inc., James Becton, Lisa Darden, Marcie

Henderson, Kent Jackman, and Claude Jay Jones, by and through their attorneys, Cuti Hecker

Wang LLP, for their Complaint allege as follows:

## <u>INTRODUCTION</u>

      1.     This action seeks to remedy the flagrantly unlawful discriminatory conduct of

Defendants – the owners, managers, and a superintendent of two apartment buildings in

Brooklyn – who routinely lie to African Americans, telling them there are no available rental

vacancies even as they usher in and encourage white applicants to apply to the actually available

apartments.  One defendant made sure to boast openly about his discrimination – touting his

discrimination as a selling point to a white applicant, shortly after having hidden an opening

from an African American – and stressing to the white applicant that "a black guy" had been

there earlier in the day, but that "we try to be careful who we rent to" because "it's a nice

neighborhood," and that "if it was somebody [who] I didn't think would be a good tenant, I[] say

[the apartments] are taken."   On another occasion, that same defendant asked to see a photograph of a white applicant's husband, and based only on the photograph of the man and seeing that he was white, the defendant immediately concluded that she and her husband would certainly make "better tenants" than others who had expressed interest in the open apartment.

2.       These racist, exclusionary statements and tactics are just two examples of the discrimination that was rooted out over the course of a two-year, in-depth investigation by the Fair Housing Justice Center ("FHJC"), a non-profit organization dedicated to ensuring that all people have equal access to housing opportunities in the New York City region.  The FHJC investigation sent African Americans as well as white testers posing as prospective tenants to buildings located at 2410 Kings Highway (the "Kings Highway Building") and 1723 East 15th Street (the "East 15th Street Building") (collectively "the Properties"), both in Brooklyn.

3.       White testers consistently were shown available and even potentially available apartments, and received follow up calls urging them to apply.  In contrast, African Americans consistently were told that no apartments were available and sent away with little or no information, often within hours or a day of white testers having being shown or told about available apartments.  Defendants are direct and unapologetic about their discriminatory behavior.

4.       Defendants' systematic and egregious discrimination must be stopped, and must be remedied.  This action seeks to do just that.

<u>**JURISDICTION AND VENUE**</u>

5.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and pursuant to 42 U.S.C. § 3613.

6.       Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b)(2).

## JURY DEMAND

7.     Plaintiffs hereby demand a trial by jury.

## PARTIES

8.     Plaintiff FHJC is a non-profit organization incorporated in the State of New York and based in New York City.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.  FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory housing policies and practices, which diverted resources away from other FHJC activities.  Defendants' discriminatory housing policies and practices also frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in the New York City region.

9.     Plaintiff James Becton is an African American man who is a citizen of the United States and a resident of New York, New York.  At all relevant times, Plaintiff Becton worked for FHJC as a tester.   Plaintiff Becton was harmed by Defendants' conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

10.     Plaintiff Lisa Darden is an African American woman who is a citizen of the United States and a resident of New York, New York.  At all relevant times, Plaintiff Darden worked for FHJC as a tester.  Plaintiff Darden was harmed by Defendants' conduct because it was humiliating and denigrating and treated her as less than her white counterparts.

11.     Plaintiff Marcie Henderson is an African American woman who is a citizen of the United States and a resident of Brooklyn, New York.  At all relevant times, Plaintiff Henderson worked for FHJC as a tester.  Plaintiff Henderson was harmed by Defendants' conduct because it was humiliating and denigrating and treated her as less than her white counterparts.

12.     Plaintiff Kent Jackman is an African American man who is a citizen of the United States and a resident of Jersey City, New Jersey.  At all relevant times, Plaintiff Jackman worked for FHJC as a tester.   Plaintiff Jackman was harmed by Defendants' conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

13.     Plaintiff Claude Jay Jones is an African American man who is a citizen of the United States and a resident of New York, New York.  At all relevant times, Plaintiff Jones worked for FHJC as a tester.  Plaintiff Jones was harmed by Defendant's conduct because it was humiliating and denigrating and treated him as less than his white counterparts.

14.     Defendant Charm Equities Ltd. ("Charm Equities") has its principal place of business at 1659 Cody Avenue, Ridgewood, New York, 11385.  On information and belief, Charm Equities manages and/or owns at least 11 buildings throughout New York City.  On information and belief, at all times relevant to this action, Charm Equities managed, owned, and/or otherwise controlled residential apartment buildings located at 2410 Kings Highway, Brooklyn, New York, 11229; and at 1723 East 15th Street, Brooklyn, New York, 11229.  On information and belief, Defendant Howard Kohn is the Chief Executive Officer and President of Charm Equities, and on information and belief, Defendant Michael Kohn runs the business alongside him.

15.     Defendant Howard Kohn is listed in corporate and government documents as the Chief Executive Officer and President of Charm Equities, as the Manager of Highway Realty LLC, and as the Managing Agent of the property located at 1723 East 15th Street.  As such, upon information and belief, Defendant Howard Kohn is responsible for establishing, supervising, and enforcing the policies and practices through which apartments at both Properties are rented, through which tenants are selected, and/or controls or should control employees, agents and/or

independent contractors who rent out available apartments at either building.  In the alternative, Howard Kohn has been granted actual or apparent authority to screen applicants and fill vacancies at the Properties by the owner-entities of such Properties.

16.     Upon information and belief, Defendant Michael Kohn works alongside Howard Kohn to run Charm Equities, and to manage both of the Properties.  As such, upon information and belief, Defendant Michael Kohn is responsible for establishing, supervising, and enforcing the policies and practices through which apartments at both Properties are rented, through which tenants are selected, and/or controls or should control employees, agents and/or independent contractors who rent out available apartments at either building.  In the alternative, Michael Kohn has been granted actual or apparent authority to screen applicants and fill vacancies at the Properties by the owner-entities of such Properties.

17.     Upon information and belief, Defendant Highway Realty LLC is the owner-entity of the building located at 2410 Kings Highway in Brooklyn, New York, 11229.  Howard Kohn signs Highway Realty LLC's biennial statements as the corporation's Manager, and in certain corporate documents Highway Realty LLC has the same listed address as Charm Equities Ltd., 1659 Cody Avenue, Ridgewood, New York, 11385.  As the owner-entity of the Kings Highway Building, Defendant Highway Realty LLC controls and/or should control the management and operation of that building and/or has given Charm Equities and/or Howard or Michael Kohn actual or apparent authority to manage or control all rental vacancies and/or other operations of 2410 Kings Highway.

18.     Upon information and belief, Defendant 1723 E15 LLC is the owner-entity of the building located at 1723 East 15th Street in Brooklyn, New York, 11229.  As the owner-entity of 1723 East 15th Street, Defendant 1723 E15 LLC controls and/or should control the management

and operation of that building and/or has given Charm Equities and/or Howard or Michael Kohn actual or apparent authority to manage or control all rental vacancies and/or other operations of 1723 East 15th Street.

19.     Upon information and belief, Defendant Michael D'Antonio is a natural person residing at 1723 East 15th Street in Brooklyn, New York, 11229.  Upon information and belief, D'Antonio is the superintendent of the East 15th Street building.  Upon information and belief, at all relevant times, D'Antonio was an employee, agent and/or independent contractor of 1723 E15 LLC and/or Charm Equities with actual and/or apparent authority to inform prospective tenants about apartments at the building, show prospective tenants apartments, screen applicants for suitability, and provide prospective tenants with applications for apartments and/or otherwise place or refuse to place prospective tenants.

## FACTUAL ALLEGATIONS

### FHJC's TRAINING AND PROTOCOL

20.     The mission of the Fair Housing Justice Center is to eliminate housing discrimination, promote open, accessible, and inclusive communities, and strengthen enforcement of the fair housing laws.

21.     FHJC dispatches individuals as "testers" – persons who pose as prospective renters or homebuyers for the purpose of obtaining information about the conduct of landlords, superintendents, real estate brokers, cooperative and condominium boards, lenders, sellers, and others to determine whether illegal housing discrimination is taking place.

22.     At all relevant times, Plaintiffs Becton, Darden, Henderson, Jackman, and Jones, as well as other testers who inquired about apartments for rent at the Properties, worked for FHJC as testers.

23.     Prior to participating in the testing investigation of any building, Plaintiffs

Becton, Darden, Henderson, Jackman, and Jones, as well as the other testers, received training

from FHJC, which included instructions on conducting a test, preparing tester report forms, and

using concealed digital audio recorders during tests.

24.     As detailed below, the testing that FHJC and its testers conducted demonstrates

that Defendants regularly discriminate against African Americans with respect to renting

apartments at the Properties in violation of federal, state, and local fair housing laws.

**FHJC's INVESTIGATIONS CONFIRM RAMPANT RACE DISCRIMINATION AT THE PROPERTIES**

**I.      Race Discrimination at the Kings Highway Building**

**A.  White Testers' Preliminary Visits Hint at Exclusionary Practices**

25.     From late March 2016 through early November 2016, FHJC sent multiple white

testers to 2410 Kings Highway.  Those preliminary tests revealed a closed system of guarded

vacancies that white applicants could discover, but hinted at exclusion.  Howard and Michael

Kohn appeared to be the gatekeepers, with Howard Kohn presenting himself as the President of

Charm Equities, frequently asking individuals if they were "working" or on a "program,"

deriding anyone who received rental assistance, and expressing his preference for Trump voters.

Michael Kohn indicated that most people learned about vacancies through friends.  He also noted

that they had buildings around "East Flatbush, Ocean Avenue, Church Avenue," and on other

occasions offered prices of rentals ranging from around $1300-1400 for one-bedroom apartments

and $1600-1700 for two-bedroom apartments.  Howard and Michael Kohn both encouraged

white applicants even when there were no available units in 2410 Kings Highway itself, offering

one white tester information about a vacancy at the East 15th Street building, and another white

tester an alternative opportunity on Ocean Parkway that was "beautiful," "gorgeous," "really nice" and "huge."

26.     Subsequent testing revealed starkly different treatment of white testers and African American applicants at two separate buildings affiliated with Charm Equities and the Kohns.

### B.   White Testers and African American Plaintiffs Receive Starkly Different Treatment at 2410 Kings Highway

27.     On May 22, 2017 at around 1:30 p.m., a white male tester visited 2410 Kings Highway ("White Tester 1").  He went to the management office inside the building and spoke to a woman named Renee and another unidentified woman, inquiring about available apartments.

28.     He was soon told that apartment 4F, a one-bedroom, was available for $1425 and that he could go view it himself.

29.     Upon returning to the office, White Tester 1 asked when the apartment would be ready and was told it would be ready in two weeks.  After more discussion in which the applicant indicated the apartment would be for himself and his wife, White Tester 1 ultimately stated that he was not going to take the apartment because he and his wife had seen something that was bigger.

30.     The next morning, on May 23, 2017, Plaintiff James Becton visited the management office at 2410 Kings Highway and spoke to Michael Kohn.

31.     Plaintiff Becton, who is African American, said that he was in the area and asked if they had any available units for rent.

32.     Despite the fact that White Tester 1 had been told the day before that apartment 4F was available, Michael responded, "I do not, I'm sorry."

33.     Plaintiff Becton said, "Nothing at all?" Michael responded, "Nothing right now."

34.     When Plaintiff Becton asked if Michael had any idea when an apartment might become available, Michael said, "I don't, I'm sorry. I just rented one out. Just recently."

35.     Only after a female agent in the office prodded Michael Kohn to take Plaintiff Becton's phone number did Michael begrudgingly ask Plaintiff Becton what he was looking for.

36.     When Plaintiff Becton said he was looking for a one-bedroom, Michael asked what he was looking to spend.  Becton said that it depended on the space.

37.     Michael quickly cut him off in a rude tone, laughing, and said, "Well I'm asking you. How much you looking to spend?"  Plaintiff Becton said that he was currently spending $1600.

38.     Michael told him to leave his name and number.  When Plaintiff Becton asked if Michael had a card, Michael refused to give one, responding dismissively, "I don't. I'll call you. If something becomes available."

39.     Plaintiff Becton said again "So there's nothing . . . do you have any idea when . . ." but Michael rudely cut him off, saying, "I don't . . . Give me your information and I'll call you if something comes up."

40.     Just 24 hours later, a white female tester ("White Tester 2") visited the 2410 Kings Highway management office, and received an entirely different reception.  She was asked if she worked and responded that she did, and was encouraged by one woman working in the office to call "Michael," the "manager" directly to find out if any apartments were available.  A few hours later, White Tester 2 returned to the Charm Equities office and spoke to Michael, telling him that she was looking for a one-bedroom apartment.

41.     Michael said that he wasn't sure whether he had one available, and asked how much she was looking to spend.  White Tester 2 replied that she was looking to spend around $1500.

42.     Michael then asked, "You're on a program or do you work? What do you do?"

43.     White Tester 2 responded with information about her job and her husband's job, adding that they were both working full time.

44.     With this additional information, Michael then disclosed that he did in fact have availability:  "actually I do . . . I may have one," adding "one may still be available."  He offered to show it to her, and said that she would need to move fast if she liked it.

45.     He asked, "Any kids? Just the two of you or . . . ?" And she replied, "Just the two of us."  He responded encouragingly, "That would be a nice size apartment."

46.     When White Tester 2 asked when the apartment would be available, Michael said "First week, second week of June. But assuming you like it, the sooner you get me information . . . whoever comes back faster and has the right things, that's who we give it to."

47.     Michael Kohn then took White Tester 2 to view apartment 4F, the same apartment White Tester 1 had been shown two days before, even though he had also told James Becton that he had nothing available one day before.

48.     On the way to view apartment 4F, White Tester 2 asked Michael if it was the only apartment available.  Michael replied that it was the only one "at the moment," but then volunteered he would have someone moving out of a smaller apartment.  He said the tenant was still there and may have someone taking over his lease so he didn't "want to promise."

49.     Michael showed White Tester 2 around apartment 4F.  When White Tester 2 asked if they had had a lot of interest, Michael said the tenant had just moved out, but that people

had already "been coming," including "this morning," and adding "it's gonna go."  He told her that the rent would be $1450.

50.     Michael proceeded to give White Tester 2 an application, and detailed information about how to apply and when he and his colleagues would be in the office.  He added that once she gave him the paperwork, they could have the apartment to her within a day.

51.     He volunteered his phone number and said to call if she wanted to come by again.

52.     Less than two weeks later, on June 5, 2017, at around 11:45 a.m., Plaintiff Lisa Darden, an African American, visited 2410 Kings Highway and spoke to Michael Kohn.  She inquired if there were any one-bedroom apartments available in the building.

53.     Michael responded: "They may be rented. Let me take your information and I'll call you if they're not," noting that the rent for the one-bedroom that might or might not be available was $1450.

54.     When Plaintiff Darden gave Michael her contact information, he said, "Ok I'll give you a call if anything comes up, all right?"

55.     Plaintiff Darden asked if Michael had a card, and he responded, "I don't have any right now, sorry. I'll give you a call."  He then added: "Someone is supposed to come back to me today. If not, I'll give you a call tomorrow. Hopefully today."

56.     When she asked whether there was a waiting list, he said, "It's first come first serve . . . But I will give you a call back."

57.     Plaintiff Darden never received a call from Michael or any other representative of Charm Equities or the Kings Highway Building.

58.     The following day, June 6, 2017, at approximately 11:50 a.m., a white female tester ("White Tester 3") visited the management office at 2410 Kings Highway and inquired about available apartments.

59.     Michael responded: "I have a one-bedroom," and asked her to hold on.

60.     While White Tester 3 was waiting for Michael to respond, a man who on information and belief was Howard Kohn jumped in and asked, "You on a program or something?"

61.     White Tester 3 responded, "Program, sorry?"  Howard said, "Who pays your rent?"

62.     White Tester 3 responded, "We do."  Howard said, "Oh, that's nice."

63.     White Tester 3 then added, "Who else will?" Howard replied, "You'd be surprised."

64.     Michael told White Tester 3 that he believed one apartment was "being taken . . . getting a deposit today" but indicated that another apartment, a one-bedroom, may be available.

65.     Michael told White Tester 3 that the rent of the apartment that may be available was $1450.

66.     Michael then made a call, which on information and belief was to Carlos Otero, the superintendent, and said, "4D, is it open now?"

67.     A female agent in the office chimed in, "You came on the right day."

68.     Michael then accompanied White Tester 3 upstairs to show her apartment 4D.

69.     On the way to view 4D, they passed Apartment 4F.

70.     Michael said "I'll you show the other one. I don't have money yet so it's still technically open."  He then showed White Tester 3 Apartment 4F from the hallway, because the floors were being refinished.

71.     Michael thereafter showed White Tester 3 apartment 4D and answered several questions about it.  He offered to give her an application if she was interested, and said that once she got her paperwork in, the process could be wrapped up by the end of the week.

## II.     Discrimination at the East 15th Street Building

72.     On September 7, 2016 at approximately 2 p.m., a white tester who had participated in the preliminary tests in March 2016 ("White Tester 4") called the number that she had been given at the Charm Equities office and spoke to Howard Kohn.

73.     White Tester 4 inquired whether there were any apartments available at the 2410 Kings Highway building.

74.     Howard said no apartments were available in that building, and proceeded to ask what White Tester 4 was looking for.

75.     White Tester 4 said she was looking for a one or two bedroom apartment.

76.     Howard responded, "Are they working people? Section 8 people? What is it?"

77.     White Tester 4 responded that the apartment was for herself and her husband, and that they both worked.

78.     Apparently satisfied with this answer, Howard responded, "Oh, ok," and proceeded to inform White Tester 4 that he had something available at 1723 East 15th Street.  He offered to show her an apartment in that building, and told her to call and speak to Michael at the same phone number that had been given out for Michael Kohn in other exchanges, instructing

her to say, "you spoke to me, Howard, and he'll fill you in."  He said either Michael or the superintendent for the building would show her the apartment.

79.     He praised the building, saying "It's right off Kings Highway. Great location, right in the middle of everything. Starbucks on the corner. You like Starbucks?"

80.     A short while later, White Tester 4 called Michael Kohn.  Michael confirmed that there was a two-bedroom available in the East 15th Street building for $1500 per month.  They agreed to meet the same afternoon at 4 p.m. for Michael to show White Tester 4 the apartment.

81.     As planned, White Tester 4 arrived at the East 15th Street building around 4 p.m. She spoke to the superintendent Michael D'Antonio, and told him that she was there to see the apartment.  D'Antonio directed her to apartment 1D.

82.     White Tester 4 arrived at 1D and spoke to Michael Kohn, who proceeded to show her the apartment and confirmed that it was "available right away."

83.     Michael gave White Tester 4 an application and then asked, "What do you do for a living?"  She responded that she was an administrative assistant in the city.  Michael responded, "Ok. And your husband works too, right?"  White Tester 4 confirmed that he did.

84.     Michael then told White Tester 4 to email him the application "as soon as possible" and that they could "do this next week."

85.     The following morning, September 8, 2016 at approximately 9:20 a.m., Michael Kohn followed up and left White Tester 4 a voicemail.  He asked her if she was still interested in the apartment, and told her that other people were looking at it.  He told her to call him back.  On information and belief, Michael Kohn followed up several more times, trying to reach White Tester 4 by calling, but not leaving voicemails.

86. Two hours later, at approximately 11:50 a.m., Plaintiff Kent Jackman visited 1723 East 15th Street and spoke with D'Antonio.  Mr. Jackman is an African American.

87. Plaintiff Jackman asked for the building supervisor, and D'Antonio told him that Michael was not there.

88. Plaintiff Jackman politely asked if there was anyone else he could speak to regarding his interest in available apartments.

89. D'Antonio responded, "No. He was here yesterday."

90. Plaintiff Jackman said, "Oh, so he's only here every now and then."

91. D'Antonio replied "Yeah."

92. Plaintiff Jackman inquired what the best time would be to check for Michael or how to reach him.

93. Only then did D'Antonio offer to give Plaintiff Jackman the office number.

94. Plaintiff Jackman told D'Antonio that he appreciated it and that he had thought Michael Kohn might have been in the building.

95. D'Antonio replied curtly: "No."

96. Plaintiff Jackman then specifically asked if Michael was the only person he could speak to about available apartments.

97. Dodging the question, D'Antonio replied, "We had some apartments, they rented. Just rented three of them."

98. When Plaintiff Jackman asked again whether there was anyone else he could speak to on Michael's behalf to find out if something was available, D'Antonio shut him down again, saying, "This is the office, the management number," on information and belief gesturing to a posted sign with that information.

99.     Plaintiff Jackman thanked D'Antonio for his assistance and asked for D'Antonio's name, and D'Antonio said it was Mike.  Plaintiff Jackman said, "Oh ok, you're a different Mike than the one that would show me…"

100.    D'Antonio replied, "Well he's the management. I'm just the super."

101.    Finally informed that D'Antonio was the superintendent of the building, Plaintiff Jackman inquired if D'Antonio knew if there were any available apartments.

102.    D'Antonio said, "There were, there were three available . . . Lot of people came, lot of applications.  He was here yesterday and he rented . . . said finally I rented them last night."

103.    When Plaintiff Jackman reiterated, "So no . . . knowledge as far as when there may be something else opening up as far as people that might be . . .", D'Antonio said, "No, they were empty a while because new owners took over. Old owners left them empty. So they sold them to these guys. Now they're rented. About a month ago . . . ."  He dismissed Plaintiff Jackman without any further information.

104.    A few hours later, at approximately 4 p.m., a white male tester ("White Tester 5") visited the building.  He found D'Antonio at around 5 p.m., and inquired whether there were any apartments available in the building.

105.    D'Antonio said, "No we had a few but they rented. Somebody else came today . . . black guy looking for apartments."

106.    White Tester 5 responded that he and his wife were looking for a new place and he was just going around the area.

107.    D'Antonio said, "Wish you had came earlier, what are you looking for? A one-bedroom? Two?"

108.    White Tester 5 said he was preferably looking for a two-bedroom, and asked if one had been available.

109.    D'Antonio replied, "Yeah there was a two. He said they're taken but I'm not sure if he was definite or not . . . the manager."  Then he volunteered, "Why don't I show you the apartment? Give me your name and number. If it's not taken then I'll call you."

110.    While they were walking to the apartment, D'Antonio said that there had been a lot of people coming but that "we try to be careful who we rent to . . . It's a nice neighborhood."

111.    D'Antonio asked if it would be White Tester 5 living in the apartment, and White Tester 5 said it would be for him and his wife.

112.    After D'Antonio had showed White Tester 5 Apartment 1D, he proceeded to show him a different one-bedroom apartment, 2D.  White Tester 5 asked if 2D was also available, and D'Antonio said, "I don't know."  Then he boasted, "If it was somebody I didn't think would be a good tenant, I would say they are taken."

113.    D'Antonio told White Tester 5 that he thought rent for the two-bedroom had been $1500, and that he had been told $1400 for the one-bedroom.

114.    D'Antonio offered to give White Tester 5 an application.  He also asked for White Tester 5's phone number and then asked "Two working people, and?"  White Tester 5 replied affirmatively.

115.    D'Antonio replied, "That's great. No kids?"  White Tester 5 confirmed that he did not have kids.

116.    D'Antonio told White Tester 5 to fill out the application and drop it off with him, and he would give it to "him," presumably referring to the management company or building owner.  He also told White Tester 5 that if he wanted to call to ask about rent and availability, he

could call the number posted in the lobby.  But he reaffirmed that "if anything happens I'll call you."

117.    A few days later on September 12, 2016, at approximately 10 a.m., D'Antonio reached out to White Tester 5, calling and leaving a voicemail, saying, "the apartment may still be available. I need your application . . . . Drop it off or give me a call."

118.    A few hours later, another white male tester ("White Tester 6") visited 1723 East 15th Street and spoke to D'Antonio.  He told D'Antonio that he was in the neighborhood looking for apartments, and asked if there was anything available in the building.

119.    Before answering the question, D'Antonio asked, "Who's it for?"

120.    White Tester 6 said "Just me and my wife" and added that there were no pets or kids.

121.    Evidently satisfied, D'Antonio said that he would give White Tester 6 an application, said "I have a two-bedroom available," and sent him to view apartment 1D, the same apartment he had shown White Tester 4 and White Tester 5.  D'Antonio told White Tester 6 that he thought the rent was $1500.

122.    When White Tester 6 asked if he had to go through a broker, D'Antonio said, "No, I'll give you the application and I'd give it right to the owner," contradicting his statements to Plaintiff Jackman four days before that he was not involved in the leasing process.

123.    D'Antonio encouraged White Tester 6 to return the application quickly, saying, in sum and substance, "Get it to me back as fast as you can because there are a few other people" interested.

124.     The following day, on September 13th at approximately 12:40 p.m., Plaintiff Jones visited 1723 East 15th Street and spoke to D'Antonio.  Plaintiff Jones is African American.

125.     Plaintiff Jones told D'Antonio that he was looking for an apartment, and asked if he had any available.

126.     D'Antonio responded, "No, we had a few but they're taken."

127.     When Plaintiff Jones asked D'Antonio if he had any idea when an apartment might open up, D'Antonio shut him down, saying "Very seldom."

128.     When Plaintiff Jones asked if there was any point when he should check back, D'Antonio repeated: "Very seldom we have any."

129.     Plaintiff Jones asked if everything was handled through a realtor or through D'Antonio.  Despite his recent comments to white testers that he was involved in the leasing process and tried to screen tenants himself, D'Antonio played down his role to Plaintiff Jones as he had to Plaintiff Jackman, saying "Some went through realtors, some went through me, some went through people in the building [who] wanted it too for their family."

130.     The following day, on September 14, 2016 at approximately 4:00 p.m., a different white male tester ("White Tester 7") visited 1723 East 15th Street and spoke to D'Antonio, asking if he was "Mike" and if there were any apartments available.

131.     D'Antonio responded: "Uh, yeah. Who told you about me?"

132.     White Tester 7 indicated that the mailbox had D'Antonio's name, and added that he had also seen a tenant who told him to speak to D'Antonio.

133.    D'Antonio said there was a two-bedroom apartment available on the fourth floor, and proceeded to show him apartment 1D, the same apartment he had shown the three other white testers.  He asked, "Is it for you?"

134.    White Tester 7 said it would be for him and his wife.

135.    D'Antonio indicated that it was a quiet, "Orthodox" neighborhood.

136.    D'Antonio asked if White Tester 7 had been told what the rent was, and when White Tester 7 said no, D'Antonio told him he thought it was $1500.

137.    He then said to White Tester 7, "I wish you would have came earlier. I had another one bedroom."

138.    A few minutes later he offered to give White Tester 7 an application, and said, "basically he looks at where you work and how much you make. Two working people or . . . ?"

139.    White Tester 7 responded, "Yeah, two working people."

140.    D'Antonio responded enthusiastically, "So that's great . . . great tenants."

141.    He then said he would call the management company and "tell them I have a very good prospect."

142.    D'Antonio also showed White Tester 7 apartment 2C, a large studio apartment that he indicated had just rented.

143.    D'Antonio added, "So the sooner you get this back to me the better. You want to do it now it's up to you."

144.    White Tester 7 said he would take the application home, talk to his wife, and then get back to him.

145.     On October 31, 2016 at approximately 12:15 p.m., another white male tester ("White Tester 8") visited the East 15th Street building and spoke to D'Antonio, inquiring whether there were any available apartments.

146.     D'Antonio said that there was no vacancy, but encouraged White Tester 8 to stop back in a couple of weeks.  He told White Tester 8 that the rate for one-bedrooms was around $1300.  When White Tester 8 said it was a great price, D'Antonio told him that he "wish[ed] [he] had came around last month."

147.     D'Antonio told White Tester 8 that it was an Orthodox neighborhood and as a result was very quiet.

148.     D'Antonio told White Tester 8 he could stop by again, and to leave his phone number.  He said he would give him a call if something became available.

149.     D'Antonio told White Tester 8 that there had been three empty apartments, but that they were rented "last month."  He said new owners had taken over about a month ago.

150.     On January 9, 2017 at approximately 12:30 p.m., another white male tester ("White Tester 9") visited the building and spoke to D'Antonio.  D'Antonio told him there were no available apartments, but encouraged him to try the building across the street, giving him the name of the superintendent in that building.

151.     On May 18, 2017, at approximately 3:30 p.m., White Tester 2 visited the building and spoke to D'Antonio.

152.     She told D'Antonio that she and her husband were looking for an apartment, and he said that he did not have anything, recommending that she try across the street.

153.   When White Tester 2 asked D'Antonio if he thought something might become available, he told her that there was a new management company that "get[s] their rentals now," indicating that he used to recommend tenants, but now "they put their people in."

154.   When she asked if there was a phone number she could take down, he said, "that wouldn't do any good," but offered to take her number.

155.   He then followed up, saying, "two people, you and your husband?"

156.   She said, "Yeah, just us."

157.   He told her that one-bedrooms cost around $1300 or 1400, and a two-bedroom had rented recently for around $1500.

158.   D'Antonio then said that he had "one guy that I don't know if he's moving or not" with a two-bedroom.  He said that if it came up, he would give the management company her number.

159.   He then asked, "So it's two working people and . . . ?"

160.   White Tester 2 said yes.  She gave him her name and number.

161.   D'Antonio told her that the tenant in the two-bedroom had not paid his rent in a while and might be moving to Florida, and that "it's a possibility" that his apartment would become available.

162.   D'Antonio took White Tester 2's phone number, and also gave her his number.

163.   On June 7, 2017 and June 8, 2017, D'Antonio reached out and called White Tester 2 several times, and in voicemails told her to call him back.

164.   On June 8, at approximately 11:20 a.m., White Tester 2 returned D'Antonio's calls.  He told her that he had an empty one-bedroom apartment for her to look at if she was still

interested, and said that the rent was $1400.  They made a plan for him to show her the apartment at 1 p.m. that day.

165.    Before ending the call, D'Antonio said, "Ok, so you'd be . . . with a husband and [do] you have any children?"

166.    White Tester 2 said it would just be her and her husband.

167.    D'Antonio then said, "Ok . . . can you bring something 'cause we like to see who's renting, you know, just bring a picture . . . if possible?"

168.    At approximately 1 p.m. on June 8th, White Tester 2 met D'Antonio at the building, and he proceeded to show her apartment 2B, which was empty.

169.    D'Antonio proudly told White Tester 2 that he tries "to screen the tenants myself," mentioning one "Jewish guy" who was apparently a former tenant as an example.

170.    D'Antonio gave White Tester 2 an application.  Then he brought up her husband again, saying, "So it's for you and your husband . . ." White Tester 2 said yes and then proceeded to ask other questions about the application.

171.    Undeterred, D'Antonio said again, "Ok, so it's for you and your husband . . . ." When she told him that her husband was at work, D'Antonio said, "Ok cause we like to see who else is, you know, who's renting it."  Then he added, "'Cause I've been doing this a long time so I . . . cover all the bases."  D'Antonio was plainly insisting that he needed to see a photograph.

172.    White Tester 2 proceeded to show D'Antonio a photograph on her phone of a white man she described as her husband.

173.    D'Antonio exclaimed, "Ok, nice guy! Red head? Ok. Very good. Ok, great."

174.    He told her that a lot of people were asking about the apartment so he would "tell them I have you," and "we'll see what happens."

175.    He then added, unprompted, "'Cause I'd rather that . . . it's hard to get to see decent tenants, too."

176.    He also asked White Tester 2 if she was Orthodox and/or Jewish, and when she said no, he said "'Cause a lot of Orthodox around here. It's a quiet neighborhood."

177.    Before she left, White Tester 2 told D'Antonio that her husband had found another apartment with a washer and dryer in the apartment, so she thought they would take that one, and returned the application to him.

178.    The following day, on June 9, 2017 at approximately 12:30 p.m., Plaintiff Henderson visited the East 15th Street building.  Ms. Henderson is African American.  After talking to some tenants, she found D'Antonio and asked if he had any apartments available.

179.    He responded: "No. We had one. It's gone."  He told her that he had rented it "a couple of weeks ago."

180.    When Plaintiff Henderson asked if there was a waiting list, D'Antonio said, "No. It depends. I have a few people waiting."  He then told her that she could stop back in a couple of weeks.

181.    When she said that she was looking for something for July 1, he said, "Let me see. Yeah, I don't have anything" available.  Then he added, "People are coming all the time. Apartments are very desirable around here."

182.    A few hours later, at approximately 3:30 p.m., White Tester 2 called D'Antonio, who quickly pandered to her saying, "How could I forget you?"

183.    White Tester 2 said that the apartment her husband had found had not worked out, and asked if apartment 2B was still available.

184.    D'Antonio said that somebody else was interested in the apartment but that he would give her the application and "see how that goes."

185.    D'Antonio said: "There's somebody else interested but I'd rather have you. You look like you would be the better tenants."

186.    When White Tester 2 asked when the apartment would be available, he said that it wouldn't be long, adding: "It's finished so . . . you were thinking of taking it before the 1st . . . if you want it?" asking if she could move in within another week.

187.    On June 13, 2017 at approximately 1 p.m., D'Antonio left White Tester 2 a voicemail message, saying that they "ha[d] somebody" for the apartment, but that if she called him back, they could "see if we can work something out," telling her to get back to him as soon as she could.

188.    On April 30, 2018, at approximately 12:30 p.m., White Tester 2 placed a follow up call to D'Antonio and confirmed that he was still the superintendent there.  He told her that there were no available apartments open, but that a tenant might be moving to Florida so she should call back in a couple of weeks.

*   *   *

189.    Defendants have engaged in egregious discrimination at both Properties, lying to African Americans to hide available apartments and turning them away, while simultaneously showing available apartments to white testers and encouraging them to apply.

190.    At the Kings Highway Building, Michael Kohn turned away Plaintiffs Becton and Darden, even though he showed white testers apartments (including the same apartment, 4F) before and after their visits.  Michael Kohn also gave White Tester 2 his contact information but refused to give his information to Plaintiff Becton or Plaintiff Darden.

191.    At the East 15th Street Building, Defendant D'Antonio showed the same apartment (1D) to white testers who visited before and after Plaintiff Jackman's visit, and to white testers who visited before and after Plaintiff Jones's visit, yet turned Plaintiffs Jackman and Jones away, deceitfully stating nothing was available.  He also told Plaintiff Henderson that nothing was available despite encouraging White Tester 2 to apply for Apartment 2B before and after Plaintiff Henderson's visit.

192.    This blatant discriminatory treatment, paired with D'Antonio's overt comments and behavior exhibiting a strong preference for white tenants, is patently illegal and has caused enormous harm.

193.    Defendants subjected individual Plaintiffs to debasement and humiliation, conveying to them that Defendants viewed them as lesser citizens than their white counterparts and that they were not welcome in the Properties.  Defendants have interfered with FHJC's core mission and required FHJC to divert significant and scarce resources from other vital projects through all their different methods of discrimination.  Their behavior furthers racial segregation in housing in Midwood and throughout New York City.  This discrimination must end.

## FIRST CAUSE OF ACTION
(Federal Fair Housing Act – 42 U.S.C. § 3601 *et seq*.)

194.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

195.    Plaintiffs are aggrieved persons as defined in 42 U.S.C. §§ 3602(d) and (i), have been injured by Defendants' discriminatory conduct, and have suffered damages as a result.

196.    Defendants' conduct as set forth above constitutes a refusal to rent, or the refusal to negotiate the rental of, or otherwise making unavailable, or a denial of housing on the basis of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).

197.     Defendants' conduct as set forth above constitutes discrimination in the terms, conditions, or privileges of the rental of a dwelling, and/or in the provision of services or facilities in connection therewith, because of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(b).

198.     Defendants' conduct as set forth above constitutes the making of statements with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race and color or an intention to make any such preference, limitation, or discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604(c).

199.     Defendants' conduct as set forth above constitutes a representation, because of race or color, that a dwelling is not available for inspection or rental when such dwelling is in fact so available in violation of the Fair Housing Act, 42 U.S.C. § 3604(d).

200.     Defendants' unlawful conduct was intentional, willful, and made in disregard for the rights of others.

201.     Accordingly, pursuant to 42 U.S.C. §§ 3613(a) and (c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
(Civil Rights Act of 1866 – 42 U.S.C. §§ 1981 and 1982)

202.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

203.     Defendants' conduct as set forth above prevented Plaintiffs from enjoying the same right to make and enforce contracts as is enjoyed by white citizens under Section 1981 of the Civil Rights Act of 1866 and the same right to lease or rent real property as is enjoyed by white citizens under Section 1982 of the Civil Rights Act of 1866.

204.     Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

205.     Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

206.     Accordingly, pursuant to 42 U.S.C. §§ 1981, 1982, and 1988, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
(New York Executive Law § 290 *et seq*.)

207.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

208.     Defendants' conduct as set forth above constitutes the refusal to rent and/or the denial of a housing accommodation and/or the withholding of a housing accommodation because of race or color in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

209.     Defendants' conduct as set forth above constitutes a representation that a housing accommodation is not available for rent or lease when in fact it is so available in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

210.     Defendants' conduct as set forth above constitutes discrimination because of race or color in the terms, conditions, or privileges of the rental of a housing accommodation or in the furnishing of facilities or services in connection therewith in violation of the New York Executive Law § 296(5)(a)(2).

211.     Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by New York Executive Law § 296(5), in violation of the New York Executive Law § 296(6).

212.     Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

213.     Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

214.     Accordingly, pursuant to Article 15 of the New York Executive Law § 297, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
(New York Civil Rights Law § 40-c)

215.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

216.     New York Civil Rights Law§ 40-c(2) provides in relevant part that:  "No person shall, because of race, creed, color [or] national origin . . . be subjected to any discrimination in his or her civil rights . . . by any other person or by any firm, corporation or institution."

217.     By engaging in the discriminatory conduct as set forth above, Defendants violated New York Civil Rights Law § 40-c.

218.     Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

219.     Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

220.     At or before the commencement of this action, Plaintiffs will have provided notice of this action to the Attorney General of the State of New York per New York Civil Rights Law § 40-d.

221.    Accordingly, pursuant to New York Civil Rights Law § 40-c, Plaintiffs are entitled to statutory damages, injunctive relief, and attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
(New York City Administrative Code § 8-107 *et seq.*)

222.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

223.    Plaintiffs are aggrieved persons, as defined in the New York City Administrative Code § 8-502(a) and § 8-107(20).

224.    Defendants' conduct as set forth above constitutes a refusal to rent or lease or other withholding of a housing accommodation because of race or color in violation of New York City Administrative Code § 8-107(5)(a)(1)(a).

225.    Defendants' conduct as set forth above constitutes discrimination because of race or color with respect to the terms, conditions, or privileges of the rental or lease of a housing accommodation in violation of New York City Administrative Code § 8-107(5)(a)(1)(b).

226.    Defendants' conduct as set forth above constitutes the declaring, printing, or causing to be declared or printed a statement or advertisement which expresses, directly or indirectly, a limitation, specification or discrimination as to race or color, in violation of the New York City Administrative Code § 8-107(5)(a)(2).

227.    Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden under New York City Administrative Code § 8-107(5), or attempting to do so, in violation of New York City Administrative Code § 8-107(6).

228.    Plaintiffs will have served a copy of this Complaint upon the City Commission on Human Rights and the Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

229.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

230.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

231.    Accordingly, pursuant to New York City Administrative Code § 8-502(a) and (g), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief and such other remedies as may be appropriate, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following relief:

a.  An order and judgment declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*., the Federal Civil Rights Act, as amended, 42 U.S.C. §§ 1981, 1982, the New York State Human Rights Law, New York Executive Law § 290 *et seq*., and the New York City Human Rights Law, New York Administrative Code § 8-107 *et seq*.;

b.  An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation from:

(i)  refusing to rent or lease, or refusing to negotiate for the rental or lease of, or otherwise making unavailable or denying a dwelling or housing accommodation to any person because of race or color;

(ii) discriminating against any person in the terms, conditions, or privileges of the rental or lease of a dwelling or housing accommodation, or in the provision of services or facilities in connection therewith, because of race or color;

(iii) making statements with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race and color, or an intention to make any such preference, limitation, or discrimination;

(iv) making a representation, because of race or color, that a dwelling is not available for rental when such dwelling is in fact so available;

(v) aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by the New York State Executive Law and New York City Human Rights Law; and/or

(vi) coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act, as amended;

c.   An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation to:

(i)  make all necessary modifications to their policies, practices, and procedures of offering rentals or leases of dwellings or housing accommodations to the public;

(ii) train all management, agents, and employees on fair housing laws;

(iii) display an Equal Opportunity logo (or statement to that effect) on all advertisements for dwellings and rental property and display in all offices HUD, state, and local fair housing posters;

(iv) allow monitoring of their rental screening and application process and decisions;

(v) retain records to allow for appropriate monitoring;

(vi) develop written procedures on rental and lease processes and fair housing policy

to be distributed to all staff and all rental applicants;

(vii) undertake active efforts and steps to ensure that African Americans seek out and

obtain assistance from Defendants and are assisted in meaningful ways to rent and

lease apartments; and

(viii) establish a system so that their employees or agents can be tested for unlawful

discriminatory practices;

d.  An order and judgment awarding compensatory and punitive damages;

e.  An order and judgment awarding Plaintiffs' reasonable attorneys' fees, costs, pre- and

post judgment interest and expenses incurred in prosecuting this action; and

f.  Any further relief that may be just and proper.


Dated: New York, New York
       September 5, 2018

By: _____
       Mariann Meier Wang
       Heather Gregorio


CUTI HECKER WANG LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2603


*Attorneys for Plaintiffs*